## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| SCHARLENE BROOKS, STEPHEN N. FOX & NORA FOX JTWROS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED DEVELOPMENT FUNDING III, UMT SERVICES, INC., UMTH GENERAL SERVICES, L.P., UMTH LAND DEVELOPMENT, L.P., UMT HOLDINGS, L.P., HOLLIS M. GREENLAW, TODD ETTER, CARA D. OBERT, BEN L. WISSINK<br><br>Defendants. | Case No.: 4:20-CV-00150-O<br><br><br><br><br><br>**CORRECTED SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

1. Scharlene Brooks, Stephen N. Fox, and Nora Fox JTWROS ("Plaintiffs"), by and through undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. As to all assertions of fact counsel either believes there is evidentiary support or that there likely will be after a reasonable opportunity for discovery. Plaintiffs' contentions are based upon, among other things, lead counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by United Development Funding III ("UDF III") and other United Development Fund-sponsored investment programs (collectively "UDF Programs") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by UDF III, UDF IV and other entities in the UDF Programs; (c) review of the SEC Complaint against UDF III and UDF IV which was settled in July 2018 and other publicly available information and lawsuits concerning UDF IV, UDF V and the UDF Programs; (d) information provided pursuant to FOIA requests to the SEC

for information concerning its investigation, including documents generated in the SEC's Division of Enforcement's Administrative Proceeding *In the Matter of UDF III, et al.*, File No. 3-18832; (e) Public Company Accounting Oversight Board ("PCAOB"), Release No. 105-2020-002, March 24, 2020, "Order Instituting Disciplinary Proceedings, Making Findings And Imposing Sanctions, In the Matter of Whitley Penn LLP, Susan Lunn Powell, CPA, Jeffrey Shannon Lawlis, CPA and John Griffin Babb, CPA, Respondents" ("Order"); (f) the denial of summary judgment motion of, *inter alia*, Defendants United Development Funding LPs I through V in action entitled *Megatel Homes III LLC v. United Development Funding LP, et al.*, Case No. DC 18-04147, Dallas County District Court, 298th Judicial District; (g) the Verified Complaint in *Fannin, et al. v. UMTH Land Development LP*, Delaware Chancery Court, C.A. No. 12541-VCMR; and (h) the complaint action entitled *Megatel Homes LLC, et al. v. Mehrdad Moayedi, et al.*, including United Development Funding LP III, U.S.D.C. N.D. Tex. 20-cv-688, as well as below signed counsel's law firm's participation in In Re UDF IV Securities Litigation in the Norther District of Texas, Case No. 3:15-cv-04030-M, of which the Court may take judicial notice.

2.      Plaintiffs bring this class action under Rule 23(b)(2) and/or (b)(3) Fed. R. Civ. P. and the Texas Securities Act and the common law on behalf of all persons or entities who purchased UDF III units in its Dividend Reinvestment Plan ("DRIP"), from  November 20, 2013 through the present, (the "Class Period").  UDF III was never listed on any exchange and is thus not subject to the Securities Litigation Uniform Standards Act.

I.      **NATURE AND SUMMARY OF THE ACTION**

3.      This  action arises out of the third in a series of investment offerings known as United Development Funds, all of which have essentially failed.  In July 2018, a complaint filed

by the Securities Exchange Commission revealed for the first time that UDF III's reported financial and operational success in investing in, and lending for, real estate development projects (upon which UDF III's dividend payments depended) was false.  The SEC made public a scheme whereby UDF III was receiving funds from subsequent UDF investment vehicles, *i.e.* UDF IV and UDF V, to allow UDF III to pay distributions. Accordingly, Plaintiffs and class members were duped into foregoing the receipt of cash distributions from UDF III and using those distributions to purchase UDF III units in the Dividend Reinvestment Plan ("DRIP") from 2010 through suspension of the dividend reinvestment program in 2016.

4.     The United Development Funding family of investment funds raised investor capital in the UDF III offering with the implied and express representation that investors' capital would be used to finance home builders and land developers and earn a return on loans to builders and developers which would allow UDF III to pay distributions to Plaintiffs and class members. However, as it was later alleged by the SEC, and the UDF Defendants[1], used money from investors in UDF IV and V to prop up UDF III without disclosing same to Plaintiffs and class members. Defendants thereby created the appearance that UDF III was a successful, productive investment for Plaintiffs and other class members who were induced to reinvest their distributions into more UDF III units through the DRIP rather than take the distributions in cash.  The scheme allowed UDF to funnel cash to the UDF Entity Defendants while giving Plaintiffs and class members overvalued units in lieu of cash dividends.

5.     UDF III solicited DRIP investments in UDF III by stating the ability to generate

---

[1]     The UDF Entity Defendants are United Development Funding III, UMT Services, Inc., UMTH General Services, L.P., UMTH Land Development, L.P.  UDF Individual Defendants are UMT Holdings, L.P., together with Hollis M. Greenlaw, Todd Etter, Cara D. Obert and Ben L. Wissink (the "Individual Defendants") (both groups collectively sometimes referred to as "UDF Defendants").

significant annualized returns and to pay investors regular distributions.  UDF III began offering limited partnership interests around 2006 and raised millions from private investors.  UDF launched UDF IV around 2008 and raised millions from investors.

6.      From at least January 2011, UDF III concealed that UDF IV and UDF V were lending money to UDF III borrowers to allow those borrowers to pay back to UDF III outstanding loans and fees and damages and interest thereon.  UDF III would then pay distributions to investors in UDF III, without adequately disclosing the sources and uses of such funds from UDF III borrowers, the financial condition of UDF III or its true operating results or the fact that UDF III's loan portfolio was overly concentrated with loans to borrowers in violation of relevant partnership agreements and was misrepresenting the nature and status of those loans.

7.      The UDF III prospectus and registration statement pursuant to which the DRIP units were issued and periodic filings with the SEC during the Class Period omitted any disclosure of the following facts:  (i) UDF III loans were being paid down with monies raised by UDF IV and UDF V and loaned by those entities to UDF III borrowers who were then directed to use funds they borrowed from UDF IV and UDF V to pay loans they owed to UDF III; (ii) UDF III failed to disclose that from 2011 through 2015 it was exceeding loan limit restrictions set forth in its Partnership Agreement; (iii) UDF III failed to disclose that its loans were invested in unimproved real property and falsely implied that all UDF III loans were funding projects under construction; and (iv) UDF III failed to disclose at least as early as end of 2013 that approximately $80 million in loans to one of UDF III's largest borrowers was impaired.

8.      Like traditional Ponzi schemes, the UDF III and the UDF Defendants always needed more cash to sustain their scheme.  To raise money they had to demonstrate past success.

UDF Defendants and UDF III therefore needed to portray UDF III as operating profitably, getting repaid on its loans and funding dividends as represented in the Registration Statement and incorporated SEC filings.   When Plaintiffs and other class members re-invested their cash dividends into UDF III through the DRIP, UDF III was able to conserve cash and foist more overvalued units on Plaintiffs and the class.

9.     Defendants UMT Services, Inc., UMTH General Services, L.P., UMTH Holdings, L.P., Greenlaw, Etter, Obert and Wissink, under various governing documents of the partnerships and other Defendant entities, had the power to exercise control and influence over UDF III and/or UMTH Land Development, L.P. and exercised the same to cause UDF III to issue materially false and misleading Registration Statements and incorporated documents and to use investors' funds from UDF IV to pay borrowers' loans due and owing to UDF III and to cause UDF III to conceal the material deterioration of major loans in the UDF III portfolio and to cause UDF III to provide materially false and misleading borrower cash flow statements to Whitley Penn.

10.     The UDF Defendants herein participated and assisted in, and/or facilitated UDF III's scheme.  In particular, independent public accountant, defendant Whitley Penn LLP, audited not only the financial statements of UDF I, UDF III, UDF IV and UDF V, but also those of affiliated entities whose investors and creditors benefitted directly and indirectly from the scheme by UDF III, IV and UDF V capital.  Whitley Penn certified UDF III's 2014annual financial statements which were included in Form 10-Ks incorporated by reference into The Registration Statement.

11.     Since the fact and extent of UDF III's scheme and misstatements and omissions became known, the UDF III shares are now worth only a fraction of the $20.00 per share value at

5

which DRIP shares were sold to Plaintiffs and the Class. UDF III has publicly admitted that its general partner has not determined to date an estimated value of the units since March 2015.

12.     In April 2019, UDF III filed a Form NT 10-K for the fiscal year ended December 31, 2018 and therein disclosed that it was unable to file its annual report because of ". . . the lack of final financials for the year ended December 31, 2018." On information and belief no annual report for 2019 has been filed either. That marked the fifth year in a row that UDF III has been unable to file any quarterly or annual financial reports due to the lack of "final financials" despite the publicly reported engagement of new auditors, Eisner Amper LLP on or about June 30, 2016 to replace Whitley Penn.

## II.     JURISDICTION AND VENUE

13.     Defendant UDF III has a principal place of business in Grapevine, Tarrant County, Texas, which is located in this judicial district. Venue is therefore proper in this District.

14.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and the Class comprises at least 100 members on information and belief, between 1/3 and 2/3 of UDF III shareholders are citizens and/or residents of states other than Texas and at least one Plaintiff has citizenship diverse from at least one Defendant.

## III.     PARTIES

### a.     Plaintiffs

15.     Plaintiff Scharlene Brooks is a citizen and resident of a suburb of Houston, Texas. She purchased UDF III shares in the DRIP during the Class Period. Plaintiff Brooks reinvested

her UDF III dividends every month from at least January 2011 through July 24, 2012 at the rate of approximately $500 per month and continues through the present to be stuck in UDF III without liquidity or dividends.

16.     Plaintiffs Stephen N. Fox and Nora Fox JTWROS are citizens and residents of New York State.  Plaintiffs purchased UDF III shares in the DRIP during the Class Period on a monthly basis from January 20, 2010 through January 28, 2016.

### b.     Defendants

#### 1.     UDF III

17.     Defendant UDF III is a Delaware Limited Partnership formed in 2005, with its principal executive offices located at 1301 Municipal Way, Suite 100, Grapevine, Texas 76051. It sold DRIP shares to Plaintiffs and the Class during the Class Period and used a materially false and misleading Registration Statement, Prospectus, and documents incorporated therein ("Registration Materials").

#### 2.     UDF Entity Defendants

18.     UMTH Land Development, L.P. ("UMTHLD") is a Delaware limited partnership formed in 2003 that is the general partner of UDF III.  UMTHLD participates in the control and management of UDF III's daily operations and business.  By virtue of its duties and responsibilities as the asset manager for UDF I, II, IV and UMTHL, UTMHLD was aware of transactions such as financings involving UDF III's loans and other activities and was responsible for the misconduct occurring at those entities.

19.     Defendant UMT Services, Inc. ("UMTS"), is the General Partner of Defendant UMTHLD and also general partner of UMT Holdings, L.P. (which is a limited partner of

UMTHLD) and is the general partner of Defendant UMTH General Services, L.P.  As general partner of UMTHLD, UMTS controls UMTHLD, which in turn controls UDF III.  Greenlaw is its CEO and 50% owner and Defendant Etter is its Chairman and 50% owner.

20.     Defendant UMT Holdings, L.P. ("UMTH") is the Limited Partner (Delaware) for both Defendant UMTH General Services, L.P. and Defendant UMTHLD.  UMTH holds 99.9% of limited partnership interests in UMTHLD which allows it to control UMTHLD which in turn controls UDF III.  UMTH also served as UDF IV's asset manager during the UDF IV Class Period.  UMTH's role as asset manager was to "identify and underwrite real estate professionals in each region or, in some cases, each sub-market in which [UDF IV] invest[ed], and... utilize these proprietary strategic partner relationships to actively manage each loan or investment."

21.     Defendant UMTH General Services, L.P. ("UMTHGS") is a Delaware Limited Partnership which assists defendant UMTHLD in managing UDF III.  UMTHGS is also General Partner of Defendant UDF IV and its "advisor."

22.     The UDF Entity Defendants shared a common group of directors, officers. executives, general partners and limited partners *(i.e.,* the UDF Individual Defendants, defined *infra),* headed in particular (if not solely) by Defendants Greenlaw, Etter, Wissink and Obert.  As alleged more fully herein, the UDF Entity Defendants by and through the UDF Individual Defendants were individually and collectively instrumental in the orchestration and implementation of UDF III scheme described herein including the issuance of the Registration Materials to foist overvalued shares upon Plaintiffs and class members.

### 3.     The UDF Individual Defendants

23.     Defendant Hollis M. Greenlaw ("Greenlaw") was, at all relevant times during the Class Period, the Chief Executive Officer UDF III, of UMTHLD and CEO and Chairman of the Board of Trustees for UDF IV and UDF V.  Greenlaw signed the UDF III Registration Statement, prospectus as well as numerous additional SEC filings which were used to register and issue the DRIP shares.  Greenlaw is one of three Voting Investment Committee members of UMTHLD. Greenlaw owns 32.83% of UMTH, 50% of UMT services, 50% of United Development Funding II, Inc.

24.     Defendant Todd Etter ("Etter") was, at all relevant times the Executive Vice President of UMTHLD, Director and Chairman of UMTS, its general partner, and Chairman of UMTH.  Etter is one of three Voting Investment Committee members of UMTHLD and is on the UDF IV Investment Committee.  He is listed among "key personal" of UDF IV.  Etter owns 50% of UMT Services and 30% of UMTH.  Etter signed the UDF III registration statement, prospectus and SEC filings incorporated therein which were used to issue the DRIP shares.

25.     Defendant Cara D. Obert ("Obert") was, at all relevant times during the Class Periods, CFO of UMTHLD, and CFO and Treasurer of both UDF I and II and IV and treasurer of UDFX, Inc.  Obert owns 4.82% of UMTH.  From 2008 through 2017 she was UDF III's principal financial officer and principal accounting officer.  She signed numerous SEC filings for UDF III and UDF IV.  She is a CPA and is identified as UDF IV "Key Personnel."  Obert signed the UDF III registration statement, prospectus and SEC filings incorporated therein which were used to issue the DRIP shares.

26.     Defendant Ben L. Wissink ("Wissink") is the President of UMTHLD, as well as COO of UMTS.  He is a partner of UMTH owning 10.09%.  He served on the UMTHLD Investment Committee.  Wissink is listed among "Key Personnel" of UDF IV.  According to UDF IV's website, Wissink has been involved with UDF since 2005 and was personally involved in the management of UDF loans at UDF I, II and III.

27.     Defendants Greenlaw, Etter, Obert and Wissink, (the "UDF Individual Defendants"), because of their positions at UDF III and/or their senior positions with numerous other UDF affiliates, possessed the power and authority to control and did control the content and form of UDF III registration statements, prospectuses, annual reports, quarterly reports, press releases and other materials provided to the SEC, securities analysts, money and portfolio managers and investors.  The UDF Individual Defendants and UDF Entity Defendants authorized the publication of the documents and materials alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with UDF III, and/or their senior positions with numerous UDF affiliates, they had access to material non-public information, and they knew, or recklessly or negligently failed to know, that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading.  As members of the Voting Investment Committee of Defendant UMTHLD, the general partner of UDF III with control and management of UDF III's business, and asset manager to UDF IV, those Defendants would have been the persons making the decisions about deploying UDF III's and IV's cash, and loans and borrowings and transfers among the UDF entities.

10

IV.     **CLASS ACTION CLASS ACTION ALLEGATIONS**

28.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of a class consisting of individuals and/or entities who purchased or otherwise acquired UDF III securities in the DRIP from November 21, 2013 through November 21, 2018 inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, UDF III units were issued by UDF for the DRIP at the price of $20.00 per unit.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believes that there are thousands of members in the proposed Class.  As of the present, UDF III issued over 1 million units in its second DRIP available to UDF III's approximately 9,000 unitholders during the Class Period.  The DRIP offered during the Class Period was the second DRIP offering by UDF III and from time to time is referred to hereafter as the "Second Drip."  Members of the Class may be identified from records maintained by UDF III and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the state securities laws were violated by Defendants' acts as alleged herein and whether Defendants are liable therefor;

(b)     whether The Registration Materials extant during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of UDF III;

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages; and

(d)     whether Plaintiffs and class members are entitled to rescission with respect to all Second DRIP purchases during the Class Period.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.     FACTUAL ALLEGATIONS

### A.     The UDF Funds

34.     Greenlaw and Etter founded UDF with the aim of starting one or more investment

12

funds to loan money to developers of residential real estate, with rates above those offered by commercial lenders.  Over time, UDF established a family of investment funds (*i.e.,* UDF I, II, III, IV and V) that each raised money from investors.  UDF III represented that the fund would strive to make an annualized return for investors based on the ability of the fund's borrowers to successfully develop real estate and repay their loans.  UDF explained UDF III as being appropriate for investors seeking "current interest income."  This contention will likely have evidentiary support after a reasonable opportunity for discovery.

35.     In August 2005, UDF filed a Form S-11 with the SEC to offer investments in a third fund, UDF III.  UDF III represented that it was formed to originate and invest in loans for the acquisition of real property to be developed as single-family residential lots that would be sold to home builders.  UDF III is a publicly-reporting, non-traded fund.

36.     On May 15, 2006, UDF III commenced its initial public offering covering up to 12,500,000 LP Units (the "Primary Offering"),  and up to 5,000,000 LP Units to be issued pursuant to the distribution reinvestment  plan (the "First DRIP").  The offering price through the Primary Offering and the First DRIP was $20.00 per LP Unit.  The Primary Offering was terminated on April 23, 2009 and the First DRIP was terminated on July 21, 2009.  UDF III sold 16,499,994 LP Units pursuant to the Primary Offering in exchange for gross proceeds of approximately $330.3 million (approximately $290.7 million, net of costs associated with the Primary Offering). UDF III issued 716,260 LP Units pursuant to the first DRIP in exchange for gross proceeds of approximately $14.3 million.  UDF III concluded its Primary Offering in April 2009, raising approximately $350 million, which was 10 times the amount raised in its two prior funds combined.

37.    UDF III has no employees and depends upon Defendant UMTHLD, its general partner for "overall management, conduct and operation" of UDF III.  UMTHLD had "authority to act on [UDF III's] behalf in all matters. . ."  In addition, according to repetitive disclosures in the UDF Annual Reports on Form 10Ks ("10Ks") issued during the Class Period:

> Our general partner will make all decisions with respect to our management and determine all of our major policies, including our financing, growth investment strategies and distributions.

Accordingly, UMTHLD was at all relevant times in control of UDF III.

38.    In its 10-Ks (incorporated by reference) UDF III also represented that:

> Because we were organized and will be operated by our general partner, conflicts of interest will not be resolved through arms-length negotiations but through the exercise of our general partners judgment consistent with its *fiduciary* responsibility to the limited partners and our investment objectives and policies. (emphasis added)

39.    On June 12, 2009, UDF III registered 5,000,000 additional units to be offered through the second dividend reinvestment program ("Second DRIP") at the same $20.00 estimated unit value as the initial DRIP.  As of September 30, 2015, UDF III had issued 3,290,286 LP Units through the Second DRIP at the same $20 per unit in exchange for gross proceeds of approximately $65.8 million (the "Second DRIP").

40.    During the Class Period, UDF III sold the following quantities of units in the Second DRIP to Plaintiffs and class members:

2013    $10.7 million/500,000 units

2014    $9.7 million/485,000 units

2015    $7.1 million/355,000 units

41.     During the Class Period, in the Second DRIP, UDF III sold to Plaintiffs and class members over one million units, reflecting investments by Plaintiffs and class members of approximately $20 million in UDF III units issued pursuant to a materially false and misleading Registration Materials.

B.      **UDF III's Registration Materials**

42.     On June 12, 2009 UDF III filed with the SEC a Form S-3D Registration Statement for 5,000,000 units at an offering price of $20.00 per unit to be sold to existing unit holders, *i.e.*, Plaintiffs and class members, through the "Amended and Restated Distribution Reinvestment Plan."

43.     The Second DRIP was commenced on July 21, 2009 and continued through the Class Period and the Registration Statement and Prospectus with documents incorporated therein as the "Registration Materials" referred to herein remain effective for that entire time.

44.     The Registration Statement was signed by Defendants Greenlaw, Obert and Etter on June 12, 2009 and included a prospectus which was effective for the entire class period and never amended, supplemented, modified or corrected.  However, the Registration Materials were, in effect, continuously supplemented by UDF III's periodic financial statements.

45.     The Prospectus indicated that "later information filed with the SEC will update and supersede this information" and "any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 until the DRIP is terminated comprise the incorporated documents."  [Emphasis supplied].  Accordingly, all of UDF III's Form 10-Ks, Forms 10-Qs and 8-Ks and Proxy Statements filed with the SEC during the Class Period were "incorporated by reference" into the Prospectus which remained effective for every DRIP sale to

Plaintiffs and class members during the Class Period. "Future filings" including UDF III's 2011, 2012, 2013 and 2014 quarterly and annual reports on Forms 10-Q and 10-K respectively represented that Defendant "Land Development, our general partner approved an estimated value of our units of limited partnership interest equal to $20.00 per share. Three Individual Defendants Greenlaw, Etter and Obert signed all of UDF III's 10-Ks.

46.     In the Prospectus, unitholders were advised:

> There is no public trading market for our units, and there can be no assurance that a market will develop in the future. The units may be purchased under the DRP at $20.00 per unit. Our general partners arbitrarily determined the selling price of the units to be issued under the DRP, and such price bears no relationship to our book or asset values, or to any other established criteria for valuing issued or outstanding units. The selling price may not be indicative of the price at which the units may trade if they were listed on an exchange or of the proceeds that a limited partner may receive if we liquidated or dissolved.

47.     Since the offering price was "arbitrarily" set, DRIP investors were necessarily dependent upon UDF III's disclosures for information about whether to reinvest dividends or take cash. Furthermore, with no public trading market for UDF III and with UDF III offering only minimal liquidity through the redemption program, Plaintiffs and members of the class could only recover their investment if UDF III's business and operations were true to the information contained in the Registration Materials.

48.     UDF III stated that it expected to earn investment returns by originating and purchasing loans as well as charging fees for providing credit enhancements to developers (*e.g.*, loan guarantees to third-party lenders).

49.     UDF III also represented to Plaintiffs and class members that it generally structured its loans as notes with interest payments and reductions to principal or "balloon payments" tied to

cash received by the developer from the sale of a lot or parcel of land, municipal reimbursements, and refinancing.  From inception of the note until a revenue or sale event, interest on the notes would accrue and then be rolled into the periodic payments of principal and interest owed by the developer on a monthly or annual basis with the accrued interest amount being recognized by UDF III as income.  However there was no disclosure that UDF III loans were being repaid from proceeds of the sale of units in UDF IV.

50.    UDF III did not disclose that it could or would use funds from an affiliated fund  to pay distributions to UDF III investors.

51.    During the Class Period, if UDF III did not have sufficient funds on hand it would have UDF Entity Defendants make transfers from UDF IV to UDF III.  This was not disclosed  to the Plaintiffs and the class were thus led to believe that dividends were the result of successful operations of UDF III and were being conducted in accordance with the disclosures made by defendants. This contention will likely have evidentiary support after a reasonable opportunity for discovery.

52.    The Registration Materials did not describe or warn of any "Risk Factors" except to direct class members to the "Risk Factors" section in "our most recent Annual Report on Form 10-K and . . . Quarterly Reports on Form 10-Q."  The "Risks Factors" did not disclose any intention or possibility or risk that:  (i) UDF III would need its successor funds (UDF IV and V) to make loans to UDF III borrowers so those borrowers could pay their UDF III loans which UDF III need to fund dividend distributors; (ii) the risk that UDF III borrowers would be allowed by UDF III to forebear for years from developing the properties which secured loans from UDF III; (iii) the risk

17

that UDF III would or could violate its Partnership Agreement's restrictions on concentration of

loans; and (iv) that UDF III would not file Annual Reports for years.

### C. UDF III's Periodic Annual Financial Reports Filed With The SEC, Incorporated By Reference Into The Registration Statement And Prospectus, Were Materially False And Misleading

53.   UDF III's 10K filings incorporated into the Registration Materials, during the

Class Period have described its business purpose as follows:

> Our principal purpose is to originate, acquire, service, and otherwise manage, either alone or in association with others, a diversified portfolio of mortgage loans on real property (including mortgage loans that are not first in priority, participation interests in mortgage loans, and mezzanine loans) and to issue or acquire an interest in credit enhancements, such as guarantees or letters of credit.
>
> We intend to seek to make or acquire loans primarily with respect to projects where the completed subdivision will consist of homes at or below the median price of the U.S. housing market.

54.   In each annual report on Form 10-K during the Class Period, incorporated by

reference into the Registration Materials, UDF III detailed its "Principal Investment Objectives."

> ●   to make, originate or acquire a participation interest in mortgage loans (first priority and junior priority) typically in the range of $500,000 to $10,000,000, and to provide credit enhancements to real estate developers and regional and national homebuilders who acquire real property, subdivide such real property into single-family residential lots and sell such lots to homebuilders or build homes on such lots;
>
> ●   to produce net interest income from the interest on mortgage loans that we originate or purchase or in which we acquire a participation interest;
>
> ●   to produce a profitable fee from our credit enhancement transactions;

18

- to produce income through origination fees charged to borrowers;

- to maximize distributable cash to investors; and

- to preserve, protect and return capital contributions.

Investment Policy

We derive a substantial portion of our income by originating, purchasing, participating in and holding for investment mortgage and mezzanine loans made directly by us or indirectly through our affiliates to persons and entities for the acquisition and development of parcels of real property as single-family residential lots that will be marketed and sold to home builders. We may also offer credit enhancements to developers in the form of loan guarantees to third-party lenders, letters of credit issued for the benefit of third-party lenders and similar credit enhancements.

55. As part of its "Investment Policy" disclosure, UDF III's Class Period 10-K represented:

We intend to reinvest the principal payments we receive on loans to create or invest in new loans during the terms of the partnership.

. . .

Cash available for distributions are the funds received by us from operations (other than proceeds from a capital transaction or a liquidating distribution less cash used by us to pay our expenses, debt repayments and amounts set aside to create a retained earnings reserve . . .

56. UDF III's Registration Materials informed investors "developers to whom we make loans and with whom we enter into subordinate debt positions will use the proceeds of our loans and investments to develop raw real estate into residential home lots. The developers obtain money to repay our development loans by reselling the residential home lots to home builders or individuals who build a single-family residence on the lot. The developer's ability to repay our

19

loans is based primarily on the amount of money generated by the developer's sale of its inventory of single family residential lots.

57.     In the foregoing statements, UDF III failed to disclose that it would, or could, cause UDF III borrowers to take loans from UDF IV and/or UDF V so said borrows could repay loans owned to UDF III.

58.     UDF III's Registration Materials and annual reports on Forms 10-K, for at least the periods ended December 31, 2010 through December 31, 2014, and quarterly filings on Forms 10-Q for the periods ended September 30, 2010 through December 31, 2015, failed to adequately disclose the source of funds for UDF III's distributions to investors, and UDF III failed to adequately disclose the use of UDF IV funds to pay down UDF III loans and to make distributions to UDF III investors.

59.     The Plaintiffs would have considered it important in buying units in the Secondary DRIP that the true source of a portion of their received distributions were not actually coming from funds from operations as disclosed by UDF III but instead were the result of transfers from UDF IV.

60.     Defendants caused UDF III to enter into these transactions for their own benefit, including for the purpose of concealing losses facing UDF affiliated entities. Defendants shifted the risks and losses resulting from the failing UDF affiliated entities to UDF III through these transactions. The loans that UDF III provided to earlier UDF entities allowed these entities to make payments to creditors. Included among these creditors was UDF III itself which, for example, funded the UMT Loan through the UMT Participation Interest and was thereby entitled to payments made by UDF I under the UMT Loan. In other words, Defendants caused

UDF III to lend to UDF I in part so that UDF I would have sufficient liquidity to make payments back to UDF III.

61.      These loans thereby permitted earlier affiliated entities to conceal their losses. Defendants also concealed and failed to recognize impaired loans or recognize losses by consistently failing to enforce payments and obligations due from borrowers, instead extending the maturity dates on loans to the developer borrowers and loans to other affiliated entities. The contentions in this and the above paragraph 60 will likely have evidentiary support after a reasonable opportunity for discovery.

62.      UDF III's 2009 10-K in which the foregoing appeared was signed by Defendants Greenlaw, Obert and Etter on March 31, 2010 and was not superseded until the issuance of UDF III's 2010 10-K which was signed by Defendants Greenlaw, Obert and Etter on March 31, 2011. UDF III's 2011 10-K was signed by Defendants Greenlaw, Obert and Etter on March 30, 2012. UDF III's 2012 10-K was signed by Defendants Greenlaw, Obert and Etter on April 1, 2013. UDF III's 2013 10-K was signed by Defendants Greenlaw, Obert and Etter on March 31, 2014. UDF III's 2014 10-K was signed by Defendants Greenlaw, Obert and Etter on March 31, 2015.

### D.    UDF III Faces A Liquidity Crisis Which It "Solved" Through Implementation Of The "Scheme" Described Herein

63.      UDF III made substantial loans to developers and was making distributions to investors in amounts that at times exceeded developer interest payments during the same period. This contention will likely have evidentiary support after a reasonable opportunity for discovery.

64.      By 2008, the various UDF funds were struggling under the weight of the declining real estate market. UBF III was experiencing a liquidity crisis. By July 8, 2009, UDF III's cash

levels were so low that it severely limited its investors' rights to redeem their investments.  That September, to obtain desperately needed cash, UDF III paid a large origination fee and pledged <u>all of its assets</u> as security for a $15 million line of credit. UDF III then immediately exhausted this entire line of credit.

65.     UDF III, at times, did not have sufficient monthly cash flow to cover its distributions. Plaintiffs' had come to expect regular monthly income from distributions and did not want to have to pay taxes on phantom income.  Also, UDF had begun offering interests in its newest fund, UDF IV.  Because UDF emphasized UDF III's regular distributions in its prior performance disclosures to prospective investors in UDF IV, any suspension or stoppage in distributions at UDF III could harm UDF Entity Defendants' ability to raise new investor funds.

66.     In 2009, UDF III initiated the Second DRIP in order to avoid as much as possible paying distributions in cash.

### E.     UDF III Failed To Disclose That Its Lending Practices Were In Violation Of The Partnership Agreement

67.     In its annual reports, Defendants represented:

> Our investments in loans to or from any one borrower will not exceed an amount greater than 20% of the total capital contributions raised in the offering and as of December 31, 2012, our largest investment in loan to or from any one borrower is equal to 15% of the total contributions capital raised in the offering.

68.     The Partnership Agreement governing the relationship between UDF III, the General Partner and the limited partners who are class members and governs the operation of UDF III limits the amount of credit exposure of UDF III and the Limited Partners can extend to borrowers in order to avoid, among other things (i) concentrated credit risks; (ii) amount of credit transactions with affiliates; and (iii) investments in unimproved real property.   Specifically,

Section 11.3(b) of the Partnership Agreement provides:  "[t]he Partnership may not invest in or make mortgage loans to or from anyone borrower that would exceed, in the aggregate, an amount greater than 20% of the Offering proceeds."

69.      UDF III raised gross proceeds of approximately $410.4 million through its securities offerings, or approximately $370.8 million net of offering costs.  The Partnership Agreement distinguishes between "Offering proceeds" and "gross Offering proceeds."  It is clear that 20% limit is based upon "Offering proceeds" net of offering expenses.  The 20% limit therefore contractually prohibits UDF III from lending more than approximately $74.2 million (20% of UDF III's net offering proceeds of $370.8 million) to any one borrower.

70.      Starting with its 10-K filing for 2011, incorporated into the Registration Materials UDF III has provided summary information concerning certain of its loans to Defendant UDF I and its affiliates, CTMGT and its affiliates, and Buffington Land and its affiliates.  The loans to these entities are reported as percentages of the outstanding balance of "UDF III's portfolio."  The term "UDF III's portfolio" is undefined, but appears to include notes receivable (net) and the Participating Interest, excluding other assets on the balance sheet including cash and cash equivalents, restricted cash, accounts receivable, accrued interest, and "other assets."

71.      UDF III falsely represented in its Registration Materials during the period between 2012 and 2015 that UDF III had not exceeded the 20% Cap on Investments.  However, UDF III has exceeded this limit with respect to its lending to UDF I between 2010 and 2014; that it has exceeded the limit with respect to its lending to its principal borrower, Centurion CTMGT since at least 2011; and that it has exceeded the limit with respect to its lending to Buffington Land and/or Lennar Buffington since 2014.

72.     UDF III's SEC filings have contained similar misstatements for the past several years.  For example:

> Our investments in loans to or from anyone borrower will not exceed an amount greater than 20% of the total capital contributions raised in the Offering, and as of December 31, 2014, our largest investment in a loan to or from anyone borrower was equal to 16% of the total capital contributions raised in the offering.  Our investments  in loans  to or from anyone  borrower are calculated based on the aggregate amount of capital contributions raised in the Offering actually used to make or invest in loans with such borrower.  (2014 Form 10-K.);

> Our investments in loans to or from anyone borrower will not exceed an amount greater than 20% of the total capital contributions raised in the Offering, and as of December 31, 2013, our largest investment in a loan to or from anyone  borrower was equal to 16% of the total capital contributions raised in the offering.  Our investments in loans to or from anyone borrower are calculated based on the aggregate amount of capital contributions raised in the Offering actually used to make or invest in loans with such borrower.  (2013 Form 10-K.);

> Our investments in loans to or from anyone borrower will not exceed an amount greater than 20% of the total capital contributions raised in the Offering, and as of December 31, 2012, our largest investment in a loan to or from anyone borrower  is equal to 15% of the total capital contributions  raised  in the offering.  Our investments in loans to or from anyone borrower are calculated based on the aggregate amount of capital contributions raised in the Offering actually used to make or invest in loans with such borrower.  (2012 Form 10-K.); and

> Loans to or from anyone borrower will not exceed an amount greater than 20% of the total capital contributions raised in the Offering, and as of December 31, 2011, our largest loan to or from anyone borrower is equal to 20% of the total capital contributions raised in the Offering. (2011 Form 10-K.)

73.     As of December 31, 2010, UDF III's lending to Defendant UDF I and its affiliates included the UMT Participation Interest balance of approximately $57.8 million; the UDF I Loan balance of approximately $11.1 million; the UDF NP Loan balance of approximately $10.1

million; the UDF PM Loan balance of approximately $8.7 million; and the OU Land Loan balance of approximately $2.8 million.  UDF III's total balance of loans due from Defendant UDF I and its affiliates was approximately $90.5 million, well in excess of the 20% limit of approximately $74.2 million.

74.     As of December 31, 2011, UDF III's lending to UDF I and its affiliates included the UMT Participation  Interest balance of approximately $66.2 million; the UDF I Loan balance of approximately $12.6 million; the UDF NP Loan balance of approximately $11.6 million; and the UDF PM Loan balance of approximately $4.2 million.  UDF III's total balance of loans due from Defendant UDF I and its affiliates was approximately $94.6 million, well in excess of the 20% limit of approximately $74.2 million.

75.     Loans to Centurion CTMGT and affiliates represented 29% and 13% of the outstanding portfolio balance respectively.  Based upon these representations, it appears that the 20% limit with respect to the loans to Centurion CTMGT was exceeded before December 2011.

76.     As of December 31, 2012, UDF III's lending to UDF I and its affiliates included the UMT Participation Interest balance of approximately $75.2 million; the UDF I Loan balance of $12.9 million; and the UDF NP Loan balance of approximately $13.4 million.  UDF III's total balance of loans due from UDF I and its affiliates was approximately $101.5 million, well in excess of the 20% limit of approximately $74.2 million.

77.     As of December 31, 2013, UDF III's lending to UDF I and its affiliates included the UMT Participation Interest balance of approximately $70.8 million; and the UDF NP Loan balance of approximately $9.1 million.  UDF III's total balance of loans due from UDF I and its

affiliates was approximately $79.9 million, well in excess of the 20% limit of approximately $74.2 million.

78.     As of December 31, 2014, UDF III's lending to UDF I included the UMT Participation Interest balance of $74.6 million, in excess of the 20% limit of approximately $74.2 million.

**F.     UDF III Omitted Disclosing The Impaired Loans It Was Carrying At Full Value**

79.     UDF III was required to file financial statements with the SEC that complied with Generally Accepted Accounting Principles ("GAAP").   UDF III had to disclose certain information about the loans it had made to developers and inform investors if any significant outstanding loans became "impaired.

80.     A Loan is "impaired" if it is unlikely to be fully collectible.  UDF III's financial statements showed general reserves but did not show that any specific loan was impaired, a fact a reasonable investor would want to know.

81.     Among UDF III's loans to UDF I was a promissory note that was originated in December 2006 in the principal amount of approximately $6.3 million and bearing interest at a rate of 12%.  This loan (the "2006 UDF I Loan") was modified to $8.1 million in December 2008, to $12.8 million in June 2011, and to $15.6 million in June 2012.  UDF III's SEC filings do not indicate the exact balances of the 2006 UDF I Loan prior to 2010.  Between 2010 and 2012, the balance of the UDF I Loan, as recorded in UDF III's financial statements, increased as follows: $11.1 million as of December 31, 2010; $12.6 million as of December 31, 2011; and $12.9 million as of December 31, 2012.  Defendants caused UDF III to extend the 2006 UDF I Loans on five occasions.  UDF I never repaid the loan to UDF III.  Instead, in October

2013, Defendants caused UDF I to assign UDF III a promissory note payable by an unrelated party in exchange for the cancelation of the 2006 UDF I Loan. The identity of this unrelated party, and the status of the promissory note that UDF III received from UDF I, cannot be determined from UDF III's SEC filings. Plaintiffs are hopeful reasonable discovery will solve this mystery.

82.     In December 2007, UDF III originated a secured loan (the "CTMGT Loan") to CTMGT and its subsidiaries, which are Centurion American entities under common control of one individual. The CTMGT Loan commitment was originally $25 million, and was subsequently increased to $50 million in July 2008, to $64.5 million in November 2011, to $65.7 million in December 2014 and to $112.9 million in July 2015.

83.     The CTMGT Loan is a co-investment loan secured by multiple investments including current and future-acquired assets. These investments are cross-collateralized and are secured by collateral-sharing arrangements in subordinate liens covering finished lots and entitled land, pledges of the ownership interests in the borrowing entities, and guarantees. *The collateral-sharing arrangements allocate the proceeds of the co-investment collateral between UDF III and UDF I.*

84.     Effective July 1, 2015, the Defendants caused UDF III to enter an agreement with CTMGT that modified the collateral-sharing arrangements with UDF I pursuant to the CTMGT Loan. This modification agreement permitted UDF III "at its option" to defer some or all of its 75% payment preference from time to time in order that CTMGT and its subsidiaries may pay UDF I. This paragraph and the above two paragraphs will likely have evidentiary support after a reasonable opportunity for discovery.

27

85.     The UDF Defendants did not disclose the "minority limited partnership interest" held by UMTHLD in Buffington Homebuilding Group, Ltd. a Buffington Land affiliate and described it instead as a "third party borrower."  During the class period, UDF III had 27 loans outstanding to Buffington Land.

86.     It was not until its 2012 financial reports that UDF III began to report its loans to Buffington Land and Centurion as a percentage of UDF III's loan portfolio.

87.     Moreover, although Buffington Land affiliate Lennar Buffington was the borrower on $106.6 million of loans from UDF III the affiliate was never identified until late 2015 when UDF III filed an involuntary bankruptcy proceeding against Lennar Buffington.

88.     UDF III's loans to Buffington Land and Lennar Buffington had been impaired for years but UDF III did not disclose any impairment expense or reserve on its financial statement. These are facts a reasonable investor would want to know.

89.     The Defendants have concealed the financial condition of Buffington Land and its affiliates.  The documents filed in Lennar Buffington's bankruptcy proceeding indicate that it has only $8 million in assets and $143 in liabilities and that UDF III's loan balance to the entity is $106.5 million.  It is evident from these disclosures that UDF III's loan to Lennar Buffington is unrecoverable and that Buffington Land is insolvent.  UDF III has never recorded any impairment on this loan nor has it ever disclosed that Lennar Buffington and Buffington Land are insolvent.

90.     In order to conceal massive losses that UDF III was facing, the Defendants caused UDF III to provide false and misleading information concerning the financial condition of Buffington's unidentified debtor referenced in its press release of December  14, 2015, Lennar Buffington Stonewall Ranch, LP ("Lennar Buffington"), an affiliate of Buffington Land.  The

Defendants likewise caused UDF III to misrepresent UDF III's exposure to Lennar Buffington. Documents filed in connection with the Lennar Buffington bankruptcy proceeding reveal *$106.5 million* in loans made by UDF III to Lennar Buffington that will not be repaid, as well as the following:

(a)     Not only is UDF III's loan to Lennar Buffington approximately *$106.5 million* but the balance of UDF I's loan to Lennar Buffington is *$30,750,225*.

(b)     The proposed "Joint Plan of Reorganization," signed by Defendant Greenlaw on behalf of UDF I and UDF III, indicates that the land in which Defendants caused UDF III to invest, on which *no development* has occurred, had been posted for foreclosure as of November 30, 2015 by PNC Bank (which loaned Lennar Buffington $35 million).

(c)     Lennar Buffington has no ability to satisfy its loans to UDF III.

(d)     Pursuant to the proposed Joint Plan of Reorganization, Defendants propose to prioritize payment to UDF over any payment to UDF III.

(e)     UDF III's loans to Lennar Buffington have been impaired for several years but the Defendants concealed the impairment and never caused UDF III to record any impairment expense on these assets.  UDF III will now be forced to record impairments on its loans to Buffington Land and its affiliates including Lennar Buffington.

(f)     Because UDF I has suffered substantial losses through its investment in Lennar Buffington, the impairment and ability of UDF I to fulfill its 70 plus million dollar obligation to UDF III is highly doubtful and investors would want to know this information.

91.     In late 2015, Whitley Penn advised UDF III that it would not stand for re-appointment as UDF III's external auditor.  The Defendants filed materially misleading Reports

on Form 8K regarding the circumstances surrounding Whitley Penn's departure as the auditor for all UDF entities.

### G.   UDF III's Financial Problems Began To Be Revealed

92.     In December 2015 the music stopped. UDF III missed its $1.25 million installment payment to a lender due December 10, 2015 on UDF III's $10 million term loan and $5 million revolving line of credit.  Lawsuits followed, the first being filed in December of 2015 by below signed counsel.

93.     In late 2015 and early 2016, information began to emerge about UDF generally, although there was nothing specific as to UDF III to alert UDF III units buyers of UDF III's misrepresentations.  In February 2016, a search warrant was issued by a Judge of the United District Court for the Northern District of Texas which allowed the FBI to search the UDF offices and seize records and computer hard drives.  Also in February 2016 the FBI served grand jury subpoenas to several UDF principals, seeking the production of documents related to UDF's operations.

94.     In a March 23, 2016 letter to investors, UDF III suspended distribution payments and stated UDF III "feels it is prudent for UDF III to preserve cash as we continue to work with UDF III's borrowers to determine their capital requirements."

95.     UDF III's suspension of distributions was preceded (March 4, 2016) by UDF IV's default on a $28.5 million loan.  UDF IV entered into a forbearance agreement with that lender which prohibited UDF IV from (i) originating new mortgages; (ii) incurring additional debt; (iii) granting new substitute collateral to any other lenders; or (iv) dispose of any assets.

96.     The dividend suspension came as a total shock in light of the fact that as of November 16, 2015, UDF III in its quarterly report on Form 10-Q for the quarter ended September 30, 2015 reported $319 million in total assets and only $19 million of total liabilities.

97.     Finally on July 3, 2018, the SEC announced charges against UDF III and Defendants herein Greenlaw, Wissink, Etter, Obert and Hanson of misleading investors by failing to disclose the UDF III could not pay its distributions and was using money from a newer fund to pay UDF III investors.  Defendants Greenlaw, Wissink, Etter and Obert agreed to pay $8.2 million in disgorgement, interest and penalties and consented to entry of permanent injunctions.

### H.     The Roles Of Greenlaw, Etter, Wissink And Obert

98.     Greenlaw and Obert signed every UDF III and UDF IV Forms 10-K and 10-Q filed with the Commission during the Relevant Period, and Etter signed every UDF III Form 10- K filed with the Commission during the Relevant Period.  Greenlaw and Obert also, as required under Section 302 of the Sarbanes-Oxley Act, certified each of UDF III's and UDF IV's periodic filings during the Relevant Period.  In addition, Greenlaw and Obert signed several UDF IV registration statements and amendments thereto filed with the Commission during the Relevant Period and through which UDF IV offered and sold securities.

99.     Throughout the Class Period, Greenlaw, Etter, and Wissink were on UDF's Investment Committee.  Obert was the chief financial officer.  Greenlaw, Etter, Wissink, and Obert each knew, or should have known, about the transactions between UDF IV and UDF III giving rise to the transactions at issue, the transfer of the payments to UDF III investors using UDF IV funds, the collectability of UDF III's loans, and UDF IV's loans to purchase unimproved real

property.  This contention will likely have evidentiary support after a reasonable opportunity for discovery.

100.    The cumulative actions of Defendants Obert, Greenlaw, Wissink and Etter show that they had no intent to carry out the business plan described in the prospectuses but instead intended to prop up UDF III using UDF IV funds.   Their undisclosed conduct seriously impaired, if not destroyed, UDF III's financial condition:

(a)    As early as 2011, Greenlaw, Obvert, Wissink and Etter directed UDF III to engage in transactions with (i) other UDF Entities; (ii) CTMGT; and (iii) Buffington and Buffington Lennar such that loans to each exceeded 20% of UDF III assets in violation of partnership agreement provisions and which were not adequately disclosed to Plaintiffs and the Class;

(b)    As early as 2012, Defendants Greenlaw, Etter, Wissink and Obert directed and/or caused UDF III to obscure, conceal and mis-identify related party transactions between UDF III and UDF IV.

101.    Greenlaw, Obert, Wissink, and Etter knew, or should have known, that they were making or causing to be made disclosures and statements that  were false and misleading.  UDF IV's capital raising activities also provided a portion of the fees paid to the funds' advisor. Greenlaw, Etter, Obert, and Wissink collectively received millions of dollars in compensation from the advisor during the Relevant Period in the form of distributions, guaranteed payments, salary, dividends, and miscellaneous income. This contention will likely have evidentiary support after a reasonable opportunity for discovery.

## Count I

### Texas Securities Act, Tex, Rev. Civ. Art. 581-33-A
### Fraudulent Sale
### (Against Defendant UDF III)

102.    Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

103.    The Texas Securities Act ("TSA"), Tex. Rev. Stat. Art. 581-33-A, provides, in

pertinent part:

> **A. *Liability of Sellers*. (A)(2) *Untruth or Omission*.**  A person who
> offers or sells a security (whether or not the security or transaction
> is exempt under Section 5 or 6 of this Act) by means of an untrue
> statement of a material  fact or an omission to state a material fact
> necessary in order to make the statements made, in the light of the
> circumstances  under which they are made, not misleading, is liable
> to the person buying the security from him, who may sue either at
> law or in equity for rescission, or for damages if the buyer no longer
> owns the security.

104.    As alleged herein, UDF III offered or sold securities to Plaintiffs and the proposed

class by means of untrue statements of material fact and by its omission to state material facts

necessary in order to make the statements made, in the light of the circumstances under which they

were made, not misleading.

## Count II

### Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(l)
### Control Person Liability
### (Against All UDF Defendants Except UDF III)

105.    Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

106.    The TSA, Tex. Rev. Stat. Art. 581-33-F(1), provides, in pertinent part:

> **F. Liability of Control Persons and Aiders.**
> (1) A person who directly or indirectly controls a seller, buyer, or
> issuer of a security is liable under Section 33A, 33B, or 33C jointly
> and severally with the seller, buyer, or issuer, and to the same extent

> as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

107.    A person is liable as a "control person" where he or she has the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract,  or otherwise. Depending on the circumstances, a control person might include an employer, an officer or director, a large shareholder, a parent company, and a management company.

108.    As alleged herein, UDF III offered or sold securities to Plaintiffs and the proposed classes by means of untrue statements of material fact and by its omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

109.    The UDF Individual Defendants were all officers and directors of UDF III and each directly or indirectly possessed the power to direct or cause the direction of the management or policies of UDF III.  In that capacity, the UDF Individual Defendants directed and controlled UDF III's misconduct and knew or should have known of such misconduct.

110.    The UDF Individual Defendants and each of the "Entity" Defendants (UMTS, UMTH, UMTHGS and UMTHLD) are jointly and severally liable with UDF III for UDF III's violation of TSA.

## Count III

**Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(2) Materially Aiding
Violations Of The Texas Securities Act Art. 581-33(A)(2)
(Against All Entity Defendants Except UDF III)**

111.    Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

112.    The TSA, Tex. Rev. Civ. Art. 581-33-F(2), provides, in pertinent part:

> **F.  Liability of Control Persons and Aiders.**
> (2) A person who directly or indirectly with intent to deceive or
> defraud or with reckless disregard for the truth or the law materially
> aids a seller, buyer, or issuer of a security is liable under Section
> 33A, 33B, or 33C jointly and severally with the seller, buyer, or
> issuer, and to the same extent as if he were the seller, buyer, or
> Issuer.

113.    To establish liability for aiding fraud under TSA, a Plaintiffs must demonstrate:

(1) a primary violation of the securities laws occurred;

(2) the alleged aider had "general awareness" of its role in this
     violation;

(3) the actor rendered "substantial  assistance" in this violation;
     and

(4) that the alleged aider either (a) intended to deceive the Plaintiffs
     or (b) acted with reckless disregard for the truth of the
     representations made by the primary violator.

114.    An aider may be held liable where it rendered assistance "in the face of a perceived

risk" and must possess "a general awareness that his role was part of an overall activity that is

improper."

115.    As alleged herein, UDF III committed primary violations by offering or selling

securities to Plaintiffs and the proposed classes by means of untrue statements of material fact and

by their omission to state material facts necessary in order to make the statements made, in the

light of the circumstances under which they were made, not misleading.

116.    UDF Entity Defendants (other than UDF III) had an identical mental state as the

UDF Individual Defendants, who served individually and collectively as the equity owners,

trustees, directors, officers and executives of these Defendants.  Entity defendants are UMTS,

UMTH, UMTHGS and UMTHLD.

117.   UDF Entity Defendants (other than UDF III) intentionally and/or recklessly disregarded numerous red flags indicating that UDF III's Class Period financial statements were materially false and misleading, and that UDF III's offerings were therefore made in violation of TSA.

118.   UDF Entity Defendants provided substantial assistance to UDF III by structuring loans and obligations that concealed UDF III's financial condition and operations as set forth herein.

119.   All Defendants named in this Count are jointly and severally liable with UDF III's violation of TSA.

120.   The misconduct of the Defendants named in this Count was the proximate cause of the Class Members' losses, because they directly and proximately resulted in the Class Members' investments in UDF III.

121.   As a direct and proximate consequence of the misconduct of the Defendants named in this Count as described above and throughout this Complaint, Plaintiffs and the Class Members have lost a substantial portion of the money they invested in UDF III, in an amount to be determined at trial but well in excess of $5,000,000.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on their own behalf and on behalf of the Proposed Class, prays for judgment as follows:

(a)   Certifying this action as a class action pursuant  to Fed. R. Civ. Proc. Rule 23(b)(2) and/or (3);

(b)      Certifying Plaintiffs as class representative and appointing Squitieri & Fearon and Wolf Haldenstein as co-lead  class counsel;

(c)      Awarding rescission and/or rescissory damages against the UDF and all other Defendants, in favor of Plaintiffs and the members of the Proposed Class, including interest;

(d)      Awarding compensatory damages in favor of Plaintiffs and the members of the Proposed Class against all Defendants, including interest;

(e)      Awarding punitive damages in favor of Plaintiffs and the members of the Proposed Class against all Defendants;

(f)      Awarding Plaintiffs their reasonable attorneys' fees and costs; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury for all issues triable thereby.

Dated: May 26, 2020                    Respectfully submitted,


*/s/ Joe Kendall*
JOE KENDALL
State Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
Telephone:  (214) 744-3000
Facsimile:  (214) 744-3015
jkendall@kendalllawgroup.com

**SQUITIERI & FEARON, LLP**
LEE SQUITIERI
32 East 57th Street
12th Floor
New York, New York 10022
Telephone:  (212) 421-6492
lee@sfclasslaw.com

**WOLF HALDENSTEIN
ADLER FREEMAN & HERZ LLP**
MATTHEW M. GUINEY
270 Madison Avenue
New York, NY 10016
Tel: 212-545-4600
Fax: 212-686-0114
guiney@whafh.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record on May 26, 2020 via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

*/s/ Joe Kendall*
JOE KENDALL